**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

LEE R. METZ

                                    Plaintiff,

          v.                                          No. 1:06-CV-1509
                                                           (FJS/DRH)

MICHAEL J. ASTRUE, Commissioner of
Social Security,[1]

                                    Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

TOBIN & DEMPF LLP                    R. CHRISTOPHER DEMPF, ESQ.
Counsel for Plaintiff
33 Elk Street
Albany, New York 12207

HON. RICHARD S. HARTUNIAN            ANDREEA L. LECHLEITNER, ESQ.
United States Attorney for the       Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. Magistrate Judge**

**REPORT AND RECOMMENDATION**[2]

          Plaintiff Lee R. Metz ("Metz") brought this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying his application for Social Security disability insurance benefits ("DIB") and

_____

          [1]The complaint named as the only defendant Jo Anne B. Barnhart, then the
Commissioner of Social Security, as the defendant, in her official capacity.  On February
12, 2007, Michael J. Astrue replaced Barnhart as Commissioner.  Therefore, pursuant to
Fed. R. Civ. P. 25(d)(1), Astrue is substituted as the named defendant.  _See_ 42 U.S.C. §
405(g).

          [2]The matter was referred to the undersigned for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

supplemental security income ("SSI") under the Social Security Act ("Act"), 42. U.S.C. §

401 *et seq.*  Docket No. 1.  Metz moves for a finding that he is entitled to DIB and SSI

under the Act or, in the alternative, for a remand.  Metz also seeks an award of attorney's

fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) alleging that the

Commissioner's action in this case was not substantially justified.  Docket No. 1.  The

Commissioner filed an answer asserting that substantial evidence supported his findings

and determination that Metz was not disabled during the relevant period.[3]  Docket No. 6.

The Commissioner cross-moves for a judgment on the pleadings.  Docket No. 15.  For the

reasons which follow below, the Court recommends that the Commissioner's decision be

affirmed.


## I. Procedural History

On May 16, 2002, Metz filed concurrent applications for DIB and SSI pursuant to

the Act.  *See* T. 82.[4]  On August 19, 2002, the Social Security Administration

("Administration") notified Metz that they had reviewed his application and determined that

he did not qualify for benefits on either claim.  T. 36-40.  On October 20, 2002, Metz

requested a hearing before an administrative law judge ("ALJ").  T. 41.  On May 17, 2003,

the Administration notified Metz that they had received his request for a hearing before an

---

[3]The relevant period with respect to SSI is from May 16, 2002, the date of Metz's SSI application, until November 18, 2005, the date of the ALJ's decision.  The relevant period with respect to DIB is from December 1, 2000, Metz's alleged onset date of disability, until November 18, 2005, the date of the ALJ's decision.  *See* Docket No. 15; T. 82.

[4]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 5.

ALJ.  T. 43-44.  On February 25, 2004, Metz appeared with counsel at the hearing and testified before the ALJ.  T. 64.  On May 24, 2004, the ALJ notified Metz that he had reached an unfavorable decision with respect to his application for disability benefits.  T. 61-63.

On May 27, 2004, Metz requested a review of the ALJ's decision.  T. 77-78.  On October 29, 2004, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ pursuant to 20 C.F.R. §§ 404.977 and 416.1477 to (1) address Metz's concurrent application for SSI, which the ALJ did not consider in his initial decision; (2) further develop the record with respect to any medically determinable physical impairments; and (3) reassess the severity of his physical and mental impairments under Social Security Ruling ("S.S.R.") 85-28 as well as the limiting effects of his physical and mental impairments under S.S.R. 85-16 and S.S.R. 96-8p.  The Appeals Council also directed the ALJ to issue a new decision consolidating Metz's associated claims.  T. 81-84.

On September 27, 2005, the ALJ held a supplemental hearing.  T. 18.  On November 18, 2005, the ALJ again denied Metz's applications.  T. 15-17.  On January 18, 2006, Metz filed a request for review of the ALJ's decision.  T. 14.  On September 1, 2006, the Appeals Council denied Metz's request for review of the ALJ's decision, thus making the ALJ's findings the final decision of the Commissioner.  *See* T. 6-8.  This action followed.

3

## II. Contentions

Metz contends that: (1) the ALJ did not properly evaluate his subjective complaints of pain and the combined effect of his impairments; (2) the ALJ erred in concluding that he could perform light work; and (3) the ALJ erred in failing to give controlling weight to the opinions of his treating physicians.  *See* Docket No. 12.

## III. Facts

Metz is thirty-eight years old, has no children and has an eleventh-grade education. T. 35, 936.  During the tenth and eleventh grades, he received vocational training in automobile body repair through the Board of Cooperative Education Services.   T. 944. Metz alleges that he became disabled on December 1, 2000,[5] due to a learning disability, a slipped disc in his back and depression.  *See* T. 135.

Metz testified that he had a learning disability and difficulty reading and writing.  T. 947-48.  In the fourth grade, the State of New York Office of Mental Retardation and Developmental Disabilities ("OMRDD") conducted a learning disabilities evaluation of Metz and diagnosed him with developmental dyslexia with neurological impairment suspect.  T. 657-61.  OMRDD also conducted a psychological evaluation of Metz and diagnosed him

---

[5]Over the course of Metz's interaction with the Administration, he has alleged various dates for the alleged onset of his disability.  In his application for DIB dated June 13, 2002, he alleged that his disability began on December 1, 2000.  T. 130; *see also* T. 715.  In his application for SSI, signed on May 20, 2002, he stated that his disability began on November 12, 2001.  T. 702-03.  In his subsequently filed application, which the Appeals Council directed the ALJ to consolidate with his related claims, he alleged that his disability began April 14, 2004.  T. 722, 726.  As noted by the Commissioner in his brief, while the ALJ referenced plaintiff as having become disabled in 2004, he evaluated the medical evidence of record in its entirety.  Docket No. 15.

as having low average intelligence with potential for higher functioning; language and motor processing delays, probably the result of neurological impairment; and adjustment reaction to childhood.  T. 671-73.  Metz asserts that his learning disabilities persisted into adulthood as demonstrated by the State of New York Department of Civil Service having considered him eligible for an appointment pursuant to Section 55-b of New York State Civil Service Law.[6]

Metz has worked as a cleaner/janitor, as an order processor for a wireless communications company, as school bus driver, in the maintenance department of a tour bus company and as a stock handler for a flatware manufacturer. T. 172, 937-40. Beginning in 2002, Metz obtained work through the Wildwood Programs–Learning Disabilities Association of the Capital Region–which classified him as "most severely disabled."  T. 270.  In July of 2003, the State of New York Office of Mental Health ("OMH") characterized Metz's quality of work, his industriousness and resourcefulness as "below average" and his attendance at work as "unacceptable."  T. 174-75.  OMH observed that Metz was not conscientious or thorough with respect to his assignments, lacked initiative to complete tasks and needed to be constantly reminded to complete his work.  T. 174. OMH found that due to Metz's attendance and behavior, he failed to successfully complete his probation and they terminated his employment.  T. 176.

Metz had lower back pain radiating down his left leg to his foot.  T. 261.  In addition, he had cervical pain radiating down his right side.  Metz also has claimed tingling and

---

[6]Section 55-b provides that "[t]he commission may determine up to twelve hundred positions with duties such as can be performed by persons with a physical or mental disability who are found otherwise qualified to perform satisfactorily the duties of any such position."  N.Y. CIV. SERV. § 55-b (McKinney 1999).

numbness in his right hand, particularly in the webbing between his thumb and index finger, stemming from a childhood injury in which a fish tank heater electrocuted him and burned his hand.  T. 617-20.  Metz reported chronic back and neck pain.   T. 628.  Metz suffered a motorcycle accident at age nineteen and an automobile accident at age twenty-one.  T. 626.  Metz had a severe visual perception problem with deficiencies in laterality, directionality, ocular motilities, visual discrimination and visual memory.  T. 648-50.

Metz has had reclusive episodes when he isolates himself in his room or in his residence.  T. 168, 738 and 769.  Metz presented a bizarre affect often accompanied by contextually inappropriate laughter.  T. 176, 212, 769.  The record also includes evidence of bulimia, *see* T. 211, 826, major depressive disorder-moderate-with possible psychotic features, T. 27 and 810, and personality disorder schizotypal features.  T. 213.


### IV. Standard of Review

### A. Disability Criteria

A claimant seeking disability benefits must establish that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A) (2003).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him,

or whether he would be hired if he applied for work.

*Id.* at §§ 423(d)(2)(A) & 1382c(a)(3)(B) (2003).

The Commissioner uses a five step process, set forth in 20 C.F.R. §§ 404.1520 & 416.920, to evaluate DIB and SSI claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520 & 416.920 (2003).

A plaintiff has the burden of establishing disability at the first four steps. Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000). However, if the plaintiff establishes that an impairment prevents him from performing past work, the burden then shifts to the Commissioner to determine if there is other work which the claimant could perform. Shaw, 221 F.3d 132.

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the Commissioner applied the correct legal standards and whether substantial evidence supports the decision.  Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002).  Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "  Shaw, 221 F.3d at 131 (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Prentice v. Apfel, 1998 WL 166849, at *3 (N.D.N.Y. Apr. 8, 1998) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  A court, however, cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If substantial evidence supports the Commissioner's finding, then it is conclusive.  Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

**V. Discussion**

**A. Medical Evidence**

**1. Physical Impairments**

The Albany Medical Center treated Metz on March 20, 2001 for low back pain.  The

8

attending physician recommended that Metz not perform any repetitive bending or lifting and further recommended that he not lift anything greater than fifty pounds.  T. 194-95. On April 2, 2001, Dr. Joseph J. Fay, an orthopaedist, examined Metz and noted strong quadriceps and extensor hallucis longus muscles, normal range of motion in his hips, "some pain with firm pressure in the lower aspect of the 1-s spine."  T. 207, 502.  Dr. Fay reported that X-rays taken in four views were normal.  His impression was that Metz had chronic low back strain and his treatment recommendation was that Metz should "get back to his exercises."  T. 207, 502.

On May 2, 2001, Dr. James Alfandre examined Metz and noted Metz's previous treatment with Dr. Fay and that Metz had not performed physical therapy exercises as Dr. Fay had recommended.  Dr. Alfandre noted midline tenderness in Metz's lumbar spine but normal range of motion in both hips.  Dr. Alfandre's impression was low back pain.  He recommended physical therapy and anti-inflammatory medications but specifically noted that he did "not believe Darvocet[7] or Lortab[8] would be recommended . . . ."  T. 499.  Dr. John H. Kavanaugh evaluated Metz for complaints of pain in his neck and right knee on December 3, 2001.  Dr. Kavanaugh reported that Metz was hurt at work on November 21, 2001, when he fell down stairs.  Dr. Kavanaugh's diagnosis was that Metz had a cervical strain and contusion of the right knee.  Dr. Kavanaugh noted that Metz was "not disabled for work . . . ."  T. 203.

---

[7]Darvocet is a combination preparation of propoxyphene napsylate and acetaminophen.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 479, 1551  (31st ed. 2007) [hereinafter "DORLAND'S"].

[8]Lortab is a combination preparation of hydrocodone barbiturate, a semisynthetic opioid analgesic derived from codeine, and acetaminophen.  DORLAND'S 890, 1090.

On July 25, 2002, Dr. Pesho S. Kotval took a lumbar sacral spine X-ray of Metz. The X-ray did not reveal any spondylolithesis, spondylolysis or osteophytosis.[9]  He noted that the lordotic curvature was preserved and opined that the X-ray did not identify any bony or disc space pathology.  T. 223.  Dr. Aryunder Singh evaluated Metz for neck, back and knee pain in May and June of 2002.  T. 333, 335, 461.

Dr. Neil Colman examined Metz numerous times for his complaints of left knee pain.  On July 16, 2002, Dr. Colman assessed a cervical strain and chondromalacia patella[10] for Metz's left knee.  Dr. Colman recommended that Metz use an anti-inflammatory medication and prescribed physical therapy.  T. 416-17.  On February 25, 2003, Dr. Colman diagnosed Metz with a torn left lateral meniscus.  T. 522, 547.  On March 24, 2003, Dr. Colman examined Metz's left knee and noted no effusion or warmth, a full range of motion and mild crepitation.  Dr. Colman opined that Metz's left knee may suffer from internal derangement, and he recommended that he undergo an MRI.  T. 420. On May 6, 2003, Dr. Colman saw Metz for treatment of his left knee, neck and back.  Dr. Colman noted that following Metz's previous evaluation in March, Metz had an MRI on his knee.[11]  Dr. Colman noted that despite a "rather normal MRI, [Metz] continues to complain of ongoing pain in his left knee."  T. 418.

---

[9]Spondyloslisthesis is the forward displacement of one vertebra over another, spondylolsis is the dissolution of a vertebra and osteophytosis is a condition characterized by the formation of a bony excrescence.  DORLAND'S 1369, 1777-78.

[10]Chondromalacia is a softening of the articular cartilage, most frequently in the patella.  DORLAND'S 358.

[11]On April 24, 2003, an MRI revealed that Metz suffered from a mild grade II signal posterior horn medial meniscus without meniscal or ligament tears.  T. 520-21.

Upon examination of Metz's knee, Dr. Colman detected no abnormalities.  Id.
Similarly, Dr. Colman's examination of Metz's back revealed a full range of motion but with
tenderness with percussion at the mid-lumbar area. Dr. Colman took X-rays of Metz's neck
and his lumbosacral spine, which revealed no abnormalities.  Dr. Colman noted that he
advised Metz that he had no objective findings of disease and noted that Metz asked for
hydrocodone but that he declined to prescribe it.  Dr. Colman expressed concern
regarding the amount of hydrocodone that Metz took and suspected that his "complaints of
pain may be related simply to developing a physiologic dependence upon the
hydrocodone."  T. 421; see also T. 550.  On June 16, 2003, Dr. Colman again examined
Metz's left knee, noted only slight crepitation in the patellofemoral joint and assessed a
post sprain of the left knee.  T. 419.  On September 4, 2003, Dr. Colman could not identify
any pathologic entities for his left knee.   Metz asked Dr. Colman to list his neck and back
as part of his work-related injury, but aside from noting Metz's request, Dr. Colman made
no further comment on the issue.  T. 415.

Dr. Amelita Balagtas twice examined Metz at the Commissioner's request.  On July
25, 2002, Dr. Balagtas provided a medical source statement in which she opined that Metz
would have some limitations with respect to activities requiring bending, lifting, prolonged
sitting and standing as well as activities that require kneeling and squatting.  T. 220-22.
On October 12, 2004, Dr. Balagtas provided a medical source statement in which she
opined that Metz would have some limitations in activities that require bending, lifting and
prolonged sitting and standing.  She also found some limitation in activities that require
lifting, carrying, and possible grasping involving the right hand.  With respect to fine motor
activities, she noted that Metz's hand and finger dexterity were intact and that his grip

strength was four-and-a-half out of five on the right hand and five out of five on the left hand.  T. 812-14.

Dr. Arvinder Singh examined Metz for Dr. Natarajan Ravi on December 13, 2002. Dr. Singh diagnosed Metz as having cervical facet arthropathy and cervicogenic headaches.  T. 345-47.  Dr. Richard Goodman, an orthopaedist, conducted an independent medical evaluation of Metz on February 27, 2003.  He noted that Metz walked with a normal gait and had full range of motion of his cervical spine.  He also noted that patellofemoral compression produced pain in Metz's left knee.  He further noted that flexion and extension of the fingers, wrists, elbows and shoulders were symmetrical and within normal limits.  Dr. Goodman opined that Metz suffered a left knee strain, but that he had "no disability" and "could return to work . . . without restrictions."  T 540-41.

The medical record also includes treatment of Metz by Dr. Ike Boka on three dates between September and November of 2003 for pain management consultation.  Metz presented with complaints of shoulder, mid and lower back, cervical, neck and knee pain. T. 259-63.  Dr. Boka found that there was "not much knee crepitus." T. 260.  After Metz's initial visit, Dr. Boka noted that he was hesitant to start him on hydrocodone without confirmation that he already had a prescription to take the medication.  T. 263.  Dr. Boka noted after Metz's second visit that "If we are not going to write meds he will go elsewhere."  T. 260.  Dr. Boka prescribed Lortab for Metz at his third visit.  T. 259.

Dr. James Dolph diagnosed Metz with ulnar digital neuroma in his right hand.  Dr. Dolph treated Metz's episodic pain at the base of his right thumb May 27, 2004.  T. 752-54. Dr. Dominic Belmonte, an occupational medicine specialist, evaluated Metz's left knee on February 11, 2004.  Dr. Belmonte noted neither any effusion nor muscle atrophy.  He

noted some crepitus, however, with range of motion testing.  T. 481.  Dr. Belmonte opined

that Metz "sustained a traumatic injury to he left anterior knee . . . . [,] received prudent

medical treatment and has . . . reached maximum medical improvement."  T 482.   He

further noted that Metz's then current examination was consistent with some post

traumatic patellar chondromalacia.  T. 482.

On February 24, 2004, Dr. Mindy Sanders neurologically evaluated Metz.  Her

impression was that Metz suffered from chronic low back and neck pain, an orthopedic

problem with his left knee and headaches.  T. 626-27.  On March 24, 2004, Dr. Sanders

noted chronic low back and neck pain and that Metz had decided against attending

physical therapy as was previously prescribed.  Dr. Sanders noted habituation with respect

to Metz's use of Lortab and that she had discussed the matter with Dr. Steven Scheiner

who that same day had discussed detoxifying Metz from his "chronic use of Lortab."  T.

621-23.

Dr. Scheiner examined Metz's cervical spine, lumbar spine and brain via MRI on

February 26, 2004.  The MRI of Metz's cervical spine revealed "some straightening of the

normal cervical lordosis" but "no evidence of spondylolisthesis" and "no disc bulge or

herniation."  T. 329.  The MRI of Metz's lumbar spine revealed normal alignment of the

vertebral bodies, no evidence of fracture and preservation of intervertebral disc height and

signal.  Dr. Scheiner noted mild degenerative disc disease at T11-12 with mild broad disc

bulging in the lower thoracic spine.  Dr. Scheiner opined that it did not appear to cause

significant stenosis[12] or nerve root compression.  T. 330.  The MRI of Metz's brain

[12]Stenosis is an abnormal narrowing of a canal.  DORLAND'S, 1795.

revealed only mild mucoperiosteal thickening in the right maxillary sinus.  Dr. Scheiner's impression was that there was no evidence of intracranial abnormality.  T. 331.  On July 2, 2004, Dr. Scheiner wrote a prescription in which he noted that Metz remained unable to lift more than ten pounds and advised that he should continue to limit periods of prolonged standing, but that he should otherwise continue to work.  T. 640.

On April 8, 2004, Dr. Mark Price, a treating physician, discussed Metz's desire to lose weight, his use of Lortab and his cessation of smoking.  T. 802.  On April 14, 2004, Dr. Price diagnosed an exacerbation of a muscle pull or possibly a bulging disc.  T. 801. On May 17, 2004, Dr. Price noted that Metz made progress in his efforts to discontinue smoking and that he appeared less nervous and anxious.  T. 800.  On July 7, 2004, Dr. Price noted that Metz wanted to increase his dosage of methadone, but he explained that he did not feel comfortable with that course of treatment.  T. 797.  On July 19, 2004, Dr. Price opined that Metz was restricted to light duty and was capable of performing desk work. T. 796.

Dr. Goodman reviewed the medical evidence of record and provided a medical opinion on June 19-20, 2005.  T. 597-607.  He was unable to find any evidence of a medical impairment from an orthopedic perspective including back and hand pain.  Dr. Goodman opined that none of Metz's impairments established by the medical evidence in combination or separately met or equaled any impairment described in the Listing of Impairments.  He explained that there was no evidence of a herniated disc or spinal arachnoiditis, spinal stenosis or previous surgery.  Dr. Goodman explained that Metz's hand surgery was "not equal to upper extremities and, therefore, [did] not meet a listing . . . ."  T. 600.  He noted that Metz's back pain was subjective and well documented.  Dr.

14

Goodman found that Metz's impairment affected his ability to lift and/or carry and opined that he could occasionally lift fifty pounds and frequently lift twenty-five pounds. He found that Metz's impairment affected his ability to stand and/or walk and opined that he could stand or walk for six hours in an eight hour workday. Dr. Goodman found that Metz's impairment affected his ability to sit such that he could sit for about six hours in an eight hour workday. He found that Metz could push and/or pull up to seventy-five pounds. Dr. Goodman found occasional postural limitations with respect to Metz's ability to climb, balance, kneel, crouch, crawl and stoop. He found that Metz's manipulative and visual/communicative functions were unlimited. In addition, Dr. Goodman found no environmental limitations with respect to Metz's impairment. T. 597-607.

### 2. Mental Impairments

On September 27, 2001, Metz underwent testing for a comprehensive vocational evaluation report by Drs. Alayne Grand and Sheldon Grand, both psychologists and certified rehabilitative counselors at Forensic Rehabilitative Services. They found that Metz's verbal intelligence quotient ("I.Q.") was 74, his performance I.Q. was 95, and his full scale I.Q. was 82. The report noted that Metz's overall functioning was at the low-average range, but at the average range for nonverbal problem-solving tasks while his memory was in the borderline range and his process was almost average. The report concluded that the testing data supported a learning disability diagnosis and stable intellectual status. The report found that Metz had vocational potential, and that his manual and visual-perceptual skills supported a variety of unskilled to semiskilled jobs with job coaching. The

report expected that as Metz's vocational adjustment improved, so too would his emotional status.  T. 196-99.

The Albany County Mental Health Center treated Metz in June 2002.  Metz was found stable and his depression, obsessive compulsive disorder and eating disorder had subsided.  T. 565.  Dr. Annette Payne, Ph.D., examined Metz on July 25, 2002, at the Commissioner's request.  Dr. Payne provided a medical source statement in which she opined that Metz could follow and understand simple directions and instructions and perform simple, rote tasks under supervision.  She further opined that he had problems with attention and concentration and learning new tasks.  She noted that he had difficulty performing complex tasks and making appropriate decisions.  She further noted that he had difficulties relating to others and dealing with stress.  She characterized his psychiatric difficulties as moderately limiting.  T. 210-14.

Dr. Mark Tatar, a state agency psychologist reviewed the medical evidence of record and provided a mental residual functional capacity assessment on August 15, 2002.  Dr. Tatar found moderate limitations with respect to Metz's ability: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to make simple work-related decisions.  Dr. Tatar found also found moderate limitations with respect to Metz's ability: to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting.  T. 235-37.  Dr. Tatar noted dysthymic disorder and personality disorder as medically determinable impairments that do not precisely satisfy the diagnostic criteria under 20 C.F.R. Part 404, Subpt, P, App. 1,

§§ 12.04 and 12.08, respectively.  T. 244, 248.  An additional state agency medical

consultant affirmed Dr. Tatar's opinion on what appears to be September 30, 2002.  T

255.

   Dr. Abdul W. Arain performed a psychological examination of Metz on January 29,

2003, as part of a comprehensive review and concluded that his mental status, higher

functions, mood and affect were normal.  T. 512.  On September 3, 2004, Metz treated at

an outpatient mental health clinic stating that he needed to take medications.  An

assessment update summarized Metz's visit and noted no serious medical issues but

diagnosed him as having schizoaffective disorder 295.70.[13]  Karen Welthy, a certified

social worker and, apparently, a psychiatrist signed the assessment update; the

psychiatrist's signature is illegible.  T. 769.

   Dr. Brett Hartman consultatively evaluated Metz on October 12, 2004, at the

Commissioner's request.  Dr. Hartman found that Metz was functioning within the

borderline range of intelligence overall, with verbal and nonverbal abilities in the borderline

---

[13]The diagnostic criteria for schizoaffective disorder are:

(A) An uninterrupted period of illness during which, at some time, there is
either a Major Depressive Episode, a Manic Episode, or a Mixed Episode
concurrent with symptoms that meet Criterion A for Schizophrenia . . . . ; (B)
during the same period of illness, there have been delusions or
hallucinations for at least 2 weeks in the absence of prominent mood
symptoms; (C) symptoms that meet criteria for a mood episode are present
for a substantial portion of the total duration of the active and residual
periods of the illness; (D) the disturbance is not due to the direct
physiological effects of a substance (e.g., a drug of abuse, a medication) or
a general condition.

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 323 (Am.
Psychiatric Ass'n, 4th ed. 2000).

range: verbal I.Q. 79; performance I.Q. 79; and full scale I.Q. 77.  T. 809.  Dr. Hartman

provided a medical source statement in which he opined that Metz was able to follow and

understand simple directions and instructions with a fair ability to maintain a regular

schedule and make appropriate decisions.  Dr. Hartman noted obvious learning deficits,

that Metz would have difficulty performing complex tasks independently, mild attention and

concentration problems, mild-to-moderate difficulty relating adequately with others, and

mild-to-moderate difficulty in dealing appropriately with normal life stressors.  T. 810.

 Dr. Aaron Satloff, a board-certified psychiatrist and state agency physician,

reviewed the medical evidence of record on June 20, 2005.  Dr. Satloff noted that Metz's

impairment affected his ability to understand, remember and carry out instructions.  He

noted no restrictions with respect to Metz's ability to understand and remember short,

simple instructions, carry out short, simple instructions or with his ability to make

judgments on simple work-related decisions but noted moderate restrictions with respect

to Metz's ability to understand, remember and carry out detailed instructions.  Dr. Satloff

opined that Metz's impairment affected his ability to respond appropriately to supervision,

co-workers and work pressures in a work setting. Dr. Satloff noted moderate restrictions

with respect to Metz's ability to interact appropriately with the public and supervisors and

his ability to respond appropriately to changes in a routine work setting.  Dr. Satloff noted

slight restrictions with respect to Metz's ability to interact appropriately with his co-workers

and in his ability to respond appropriately to work pressures.  Dr. Satloff diagnosed major

depressive disorder, social phobia, learning disorder-not otherwise specified,

polysubstance abuse by history and borderline intellectual functioning as Metz's medical

impairments as established by the medical evidence.  Dr. Satloff considered Metz's

impairments separately and in combination and opined that they were of inadequate severity to meet or equal any impairment described in the Listing of Impairments.  T. 590-96.

### 3. Other Evidence

Katie Clark,[14] an employment specialist with Wildwood Programs, noted that Metz was "classified as most severely disabled" and opined that Metz need a structured job that had as little change in duty or schedule as possible.  T. 270.

### 4. Administrative Hearing Testimony

At the supplemental hearing on September 27, 2005, Metz testified that he worked twenty hours a week as a cleaner and earned $8 an hour.  T. 941.  Metz testified that he could not work longer than part-time hours because when he was standing on concrete floors for long periods of time, which hurt his mid and lower back and caused pain to shoot down to his left knee.  Metz further testified that by sitting down for fifteen minutes, he could continue working.  He testified that pain prevented him from working more than four hours a day.  T. 942.  He testified that he suffered an injury to his right hand as a child, which later required the removal of scar tissue.  T. 943.  Metz testified that he took methadone, Zanaflex[15] and Nexium[16] and that they helped him "a little bit."  T. 945.  Metz

---

[14]Metz includes Clark's opinion in his arguments.  S*ee* subsection V(D) *infra*. However, as an employment specialist, Clark does not qualify as an acceptable medical source under the regulations.  *See* 20 C.F.R. § 404.1513(a) & 416.913(a).

[15]Zanaflex is a preparation of tizandine hydrochloride, which is an adrenergic agonist used as a short-acting agent to manage the increased muscle tone associated

testified that when he felt depressed, he did not want to leave the house, go to work or talk to anybody.  He testified that  once a week he cleaned the floor, sink and toilet in the upstairs bathroom of the house in which he lived.  T. 949-50.  Metz testified that he vacuumed sometimes.  T. 952.  He testified that he dressed himself and tended to his personal hygiene.  T. 953.  He testified that his roommate cooked his meals, emptied the garbage, maintained the lawn, shopped for the household, and did the household laundry.  T. 950, 952.  Metz testified that as a cleaner he emptied trash cans with bags weighing between thirty and sixty pounds six to seven times during the course of the workday.  T. 951.

At the conclusion of Metz's testimony, the ALJ called Dr. Peter Manzi, a vocational expert, to testify.  T. 108, 955.  The vocational expert classified Metz's work history according to the Dictionary of Occupational Titles (4th Ed., rev. 1991)  ("DOT").  He testified that Metz's work history imparted only driving as a transferable skill.  The vocational expert further testified that such an individual such as Metz could work as a cleaner at a commercial institution and as a material handler/laborer.  T. 957-58.  The vocational expert testified that such an individual could work as a laundry worker II, DOT occupational code 361.685-018.  The vocational expert testified that laundry worker II had a specific vocational preparation ("SVP") level of two and that there were 41,490 such positions in the national economy and 220 in the Capital Region of New York.  The vocational expert

---

with spasticity.  DORLAND'S 1958, 2119.

[16]Nexium is a preparation of esomeprazole magnesium, which is a proton pump inhibitor used as a gastric acid secretion inhibitor in the treatment of symptomatic gastroesophageal reflux disease.  DORLAND'S 654, 1293.

also testified that such an individual could work as a hand packager, DOT occupational code 920.587-018.  The vocational expert testified that hand packager had an SVP level of two and that there were 106,000 and 400 such positions in the national economy and Capital Region economies, respectively.  T. 958.

The vocational expert also testified that an individual with Metz's characteristics could neither work as a laundry worker nor as a hand packager and that there were no jobs available at the medium level but that such an individual could work at the light level as a laundry sorter, a light, unskilled position, DOT occupational code 361.687-014.  The vocational expert testified that the laundry sorter position had an SVP of two and that there were 133,174 and 350 such positions in the national economy and the Capital Region, respectively.  The vocational expert also identified housekeeper, DOT occupational code 323.687-014, as another position such an individual could perform.  The vocational expert testified that the housekeeper position had an SVP of two and that there were 387,059 and 1,800 positions available in the national economy and Capital Region, respectively.  T. 958-59.  The vocational expert further testified that such an individual could perform his past work "as he performed it, he performed all of his medium work as light work."  T. 959-60.  The vocational expert testified that without the fine manipulation restriction and with a light work level, the laundry sorter and housekeeper positions would be available in addition to other examples as well.  T. 960.

### B. Severity of Impairments

In his brief, Metz argued that the ALJ failed properly to assess the severity of his

impairments.  In particular, Metz argued that the ALJ did not properly consider the

combined effect of his impairments.  Docket No. 12.  In his brief, the Commissioner does

not address this argument, which may owe to the fact that Metz included it under his

argument pertaining to issues of pain and credibility and essentially stated the argument

without any elaboration.  *Cf.* Graham v. United States, 753 F. Supp. 994, 1000 (D. Me.

1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner,

unaccompanied by some effort at developed argumentation are deemed waived.") (citation

and internal quotation marks omitted).  Nevertheless, step two of the sequential evaluation

process requires a determination as to whether the claimant has a severe impairment

which significantly limits his physical or mental ability to perform basic work activities.  *See*

subsection IV(A) *supra*; 20 C.F.R. § 404.1521(a) (2003).  Where a claimant alleged

multiple impairments, a court will consider "the combined effect of all [ ] impairments

without regard to whether any such impairment, if considered separately, would be of

sufficient severity."  Id. § 404.1523; Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995)

("[T]he combined effect of a claimant's impairments must be considered in determining

disability; the SSA must evaluate their combined impact on a claimant's ability to work,

regardless of whether every impairment is severe.").

An impairment, or combination of impairments, is not severe if it does not impinge

on one's "abilities and aptitudes necessary to do most jobs."  Id. § 404.1521.  Basic work

activities which are relevant for evaluating the severity of a physical impairment include:

(1) Physical functions such as walking, standing, lifting, pushing,
pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b) (2005)

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P.App. 1 (2003) (listing of per se disabling ailments). Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience.  DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Here, the ALJ found that Metz had a severe impairment secondary to a chronic back strain; a severe impairment secondary to a status post injury of the right dominant hand; severe impairments secondary to depression and a learning disability, anxiety, and borderline intellectual functioning.  The ALJ noted that while these impairments were severe within the meaning of the regulations, they did not "meet or medically equal, either singly *or in combination* . . . one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  T. 20 (emphasis added).

The record contains substantial evidence to support the ALJ's findings that Metz did not suffer from a listed impairment.  The list of impairments for back injuries requires either nerve compression or stenosis.  The ALJ, however, found that Metz's back injuries had "not produced reflex, motor, or sensory loss in any extremity and have not resulted in marked functional loss of use of the spine or any extremity."  T. 20.   The record illustrated that diagnostic testing and medical opinions confirmed that there existed neither significant

23

nerve root compression nor stenosis.  T. 329-30, 600.  Dr. Goodman opined that none of

Metz's impairments established by the medical evidence in combination or separately met

or equaled any impairment described in the Listing of Impairments.  T. 600.  The medical

evidence indicated that Metz maintained a full range of motion in his back, T. 421, and

further indicated that Metz did not suffer from any herniation in his back.  T. 223, 329, 600.

The medical record revealed that Metz partook in a wide variety of daily activities including

self-care and personal hygiene, clothing himself, cleaning the bathroom, floor, toilet and

sink, occasional vacuuming, watching television, playing checkers on the computer and

listening to music.  Metz testified that he cleaned the floor, sink and toilet in the upstairs

bathroom of the house in which he lived once a week.  T. 949-50, 952-53.  Moreover, Metz

decided against attending physical therapy as was prescribed by Dr. Fay and Dr. Sanders.

T. 499, 623.

        With respect to Metz's depression, anxiety and borderline intellectual functioning,

the ALJ found that his I.Q. was in the average to borderline range and did not qualify as

mild mental retardation.  The ALJ found that Metz's affective disorder had not resulted in

"significant, ongoing symptoms" and had "not resulted in significant functional limitations."

T. 20.  In support of his finding that Metz's mental impairments were not severe, the ALJ

cited Metz's ability to care for himself, his activities of daily living, and the lack of any

episodes of deterioration or decompensation.  T. 20.

        The medical record supported the ALJ's findings.  One series of tests administered

to Metz indicated that his verbal I.Q. was 74 (borderline), his performance I.Q. was 95

(average), and his full scale I.Q. was 82 (low average), T. 197, while another indicated that

his verbal I.Q. was 79, his performance I.Q. was 79, and his full scale I.Q. was 77.  T 809.

The listing for mental retardation at 20 C.F.R. Part 404, Subpt, P, App. 1, § 12.05(D) requires, *inter alia*, a verbal, performance or full scale I.Q. of 60 through 70.  Dr. Satloff considered Metz's impairments separately and in combination and opined that they were of inadequate severity to meet or equal any impairment described in the Listing of Impairments.  T. 593.  Therefore, there exists no basis to remand this case for further findings regarding whether the combination of Metz's impairments render him disabled.

### C. Subjective Complaints of Pain

Metz contends that the ALJ's decision to discredit his subjective complaints of pain was in error.  Docket No. 12.  The Commissioner argues that the ALJ properly considered Metz's allegations of pain and functional limitations in reaching his RFC determination. Docket No. 15.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain . . . ."  Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003).  " 'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.' "  Barringer, 358 F.Supp.2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin.,

2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Id.  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. *See* Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (I) [The claimant's] daily activities;
> (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medation

> [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other
> symptoms;
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s]
> received for relief of . . . pain or other symptoms;
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain
> or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20
> minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [the claimant's] functional limitations and
> restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ found suspect the degree of pain and functional loss alleged by Metz. In support of his finding, the ALJ noted that none of the multiple physicians from multiple specialities who have treated Metz have found significant pathology with respect to his musculoskeletal complaints. The ALJ also noted that Metz was able to work despite his long-standing complaints. The ALJ noted that Metz had worked on a part-time basis without "reason shown as to why he could not work on a full time basis." T. 31. Furthermore, the ALJ cited the notes of Metz's job coach, which revealed that Metz lacked the motivation to work. Thus, the ALJ concluded that Metz was not credible in reporting his subjective complaints. Id.

In reaching his conclusion, the ALJ noted Metz's testimony with respect to his alleged debilitating impairments and his medications. T. 30. Metz testified that he was totally disabled due to mid-to-low back pain that shot down to his left knee and claimed that walking more than four hours per day would be painful. Metz stated sitting down relieved his pain. He testified that he experienced some difficulty with his right hand and thumb such that he could not type. He also testified that he suffered from depression and did not want to leave the house, go to work or to talk to anyone. He further testified that his then current medications included methadone, Zanaflex and Nexium from which he

27

alleged no side effects.  T. 942-46.  Metz testified that his medications helped him "a little bit."  T. 945.

The ALJ considered Metz's daily activities, including self-care and personal hygiene, cleaning the bathroom, floor, toilet and sink, occasional vacuuming, watching television, playing checkers on the computer and listening to music.  T. 20, 23 and 28. The ALJ discussed Metz's medications, including a daily 80 milligram dose of methadone, Zanaflex once per day, Xanax once per day, Topamax once per day; Nexium once per day, Zyrtec once per day, Atenolol once per day, Atarax once per day, and Risperdal once per day.  T. 23.  The ALJ also noted Metz's use of Nexium and that he did not allege any side effects from taking these medications.  T. 30-31.

That Metz was able to engage in such a wide array of activities despite allegations of severe pain supports the ALJ's conclusion that his pain was not disabling.  *See* Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (explaining that appellant's testimony that despite her pains and shortness of breath she could cook, sew, wash and shop, albeit at a slow pace and with an afternoon break, did not preclude the possibility that she could perform gainful activity of a light sedentary nature); Berger v. Astrue, 516 F.3d 539, 545-46 (7th Cir. 2008) (finding claimant's allegations of debilitating pain less worthy of belief in light of his work as a carpenter, the performance of household chores, fishing and driving).  The ALJ noted that after the date of alleged onset of disability, Metz continued to work on a part-time basis but that his work was not at the substantial gainful level of work activity.  T. 19.  Moreover, when Metz was unemployed, he sought employment opportunities, T. 279-318, which fairly suggests that he believed that he was capable of working.  *See* Gittens v. Astrue, No. 04-CV-4386 (DLJ),2008 WL 3852179, at *6 (E.D.N.Y. Aug. 16, 2008)

(claimants testimony that he "actively sought desk jobs and believed himself capable of holding a job that didn't require heavy lifting" supported ALJ's decision that claimant's "allegations regarding his inability to work were not entirely credible"); Osorio v. Barnhart, No. 04-Civ. 7515(DLC), 2006 WL 1464193, at *7 (S.D.N.Y. May 30, 2006) (citing ALJ's observation that it " 'ma[de] no sense . . . that [claimant] would have been seeking such work if he did not feel he would be capable of doing it' " as supporting ALJ's finding that claimant's allegations were not totally credible).

The ALJ noted Metz's history of abusing pain killers, T. 26, and the record reflects that Metz engaged in drug-seeking behavior.  Metz asked for hydrocodone from Dr. Colman, whom in May of 2003, suspected that Metz's "complaints of pain may be related simply to developing a physiologic dependence upon the Hydrocodone."  T.  415 and 421. Similarly, in April 2004, Dr. Scheiner discussed with Metz the possibility of inpatient detoxification to help him overcome his need for pain narcotics.  T. 764.  Dr. Scheiner explained to Metz that "the purpose of pain management is not to write narcotic prescriptions that were started by another practitioner," T. 765, yet during his next visit on May 7, 2004, Metz again asked Dr. Scheiner whether he had spoken to Dr. Price regarding an increase in his Methadone.  T. 762.

A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations.  See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding nothing improper in ALJ's reference to treating psychologist's observation that claimant was " 'somewhat manipulative' in his efforts to 'convince' him of his pain"); Berger, 516 F.3d at 545-56 (finding claimant's credibility undermined where he received a regimen of pain medication, including hydrocodone, from two different doctors); Edlund v. Massanari,

253 F.3d 1152, 1157-58 (9th Cir. 2001) (explaining that claimant's exaggeration of physical pain in order to receive prescription pain medication to feed his Valium addiction allowed the ALJ to conclude that " 'the claimant's complaints are not credible or supported by the substantial evidence.' "); Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain").

The ALJ also noted Metz's lack of motivation to work.  T. 31.  The record reveals that on October 1, 2002, Metz informed his job coach that he no longer wanted to work at his current job, although Metz's supervisor said that he was "doing a great job."  T. 285.  Metz began employment at a hospital in December of 2003, but by January 6, 2003, he had called-in three absences.  T. 288-92.

Metz testified that at his most recent employer allowed him to sit and rest when his back pain bothered him, as when after he had emptied trash cans, so that he could resume his work.  Thus, there appears to be substantial evidence to support a finding that Metz had developed appropriate coping methods to overcome the pain he may have experienced in the workplace.

It is within the Commissioner's discretion to evaluate the credibility of a claimant's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of his symptomatology.  Mimms. v. Sec'y of HHS, 750 F.2d 180, 185-86 (2d Cir. 1984); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  Courts should accord deference to the ALJ's determination regarding a claimant's credibility "because he heard plaintiff's testimony and observed his demeanor."  Gernavage, 882 F.Supp. at 1419 n. 6.  While the ALJ's recitation of the factors leading him to reject, in part, plaintiff's subjective claims is less than comprehensive, it nonetheless

sets forth the basis for his determination, which was supported by substantial evidence. Accordingly, the ALJ's findings are entitled to deference, and the Court recommends that the Commissioner's determination on this ground be affirmed.

### D. Treating Physician

Metz contends that the ALJ did not accord proper weight to the opinions of Metz's treating physicians and vocational counselor.  Metz, however, did not identify whom among his treating physicians offered an opinion that was inconsistent with the ALJ's RFC finding.  Docket No. 12.  The Commissioner asserts that the ALJ properly determined the weight to be given to Metz's treating sources.  Docket No. 15.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Ordinarily, the opinion of a treating physician is entitled to considerable deference and is given controlling weight provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). Such opinions are not controlling, however, if contrary to other substantial evidence in the record, including the opinions of other medical experts.  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Veino, 312 F.3d at 588.  The ALJ, however, "cannot arbitrarily substitute his or her own judgment for competent medical opinion," McBrayer v. Sec'y of HHS, 712 F.2d 795, 799 (2d Cir. 1983), and must provide "good reasons" before discounting a

treating physician's opinion.  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The regulations require the ALJ to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, then the opinion will not receive controlling weight.  Moreover, the less consistent the opinion when compared against the record as a whole, the less weight the ALJ will accord to it.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  Id. at 133-34; see 20 C.F.R. § 404.1527(e).

At one point during his treatment of Metz, Dr. Scheiner wrote a prescription noting that Metz remained unable to lift more than ten pounds and admonishing that he "should continue to limit prolonged standing," and needed to "get up from sitting" twice per hour.  T. 640.  Dr. Scheiner concluded that "with these restrictions, he should continue to work."  T. 640.  While Dr. Scheiner's opinion regarding Metz's limitations is somewhat more restrictive than the balance of the record, he nonetheless concluded that Metz could work.  The ALJ must weigh the evidence of record and resolve genuine conflicts and inconsistencies therein.  Veino, 312 F.3d at 588.  The ALJ credited more weight to the opinions of Dr. Goodman, T. 21-22, see T. 597-607, Dr. Balagtas, T. 22, see T. 222 and 814, Dr. Kavanaugh, T. 25, see T. 203, and Dr. Price, T. 22, see T. 796, as more consistent with each other and with the record as a whole.

Metz also argues that the ALJ should have given controlling weight to the vocational counselor's opinion.  Docket No. 12.  The court infers that Metz is referring to the opinion of Katie Clark, an employment specialist, who in summarizing his work history, aptitudes and limitations noted that he was classified as "most severely disabled."  T. 270.  Clark does not indicate who classified Metz in this manner.  Moreover, as an employment specialist, Clark is not an acceptable medical source.  20 C.F.R. § 404.1513(a) and 416.913(a) (limiting acceptable medical sources to licensed physicians (medical or osteopathic doctors), licensed or certified psychologists and licensed optometrists, for purposes of establishing visual disorders only, licensed podiatrists, for purposes of establishing impairment of the foot and ankle only and qualified speech-language pathologists, for purposes of establishing speech or language impairments only).  Even assuming *arguendo* that Clark were an acceptable medical source under the regulations, the regulations reserve the issue of whether a claimant is disabled to the ALJ.  20 C.F.R. §§ 404.1527(e) and 416.927(e); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that a claimant is disabled cannot itself be determinative.").

Accordingly, it is recommended that the Commissioner's determination on this ground be affirmed.

### E. Residual Functional Capacity - Light Work

Metz contends that substantial evidence does not support the ALJ's finding that he retained the residual functional capacity (RFC) to perform light work existing in significant numbers in the national economy.  Docket No. 12.  In his brief, the Commissioner qualifies

Metz's characterization noting that the ALJ found that he could perform only a limited range of light work and not the full range of light work suggested by his argument.  The Commissioner asserts that the ALJ properly evaluated the evidence with respect to Metz's physical and mental impairments and set forth substantial evidence to support his finding.  Docket No. 15.

RFC describes what a claimant is capable of doing despite his impairments considering all relevant evidence, including physical limitations, symptoms and other non-symptomatic  limitations.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F.Supp.2d at 150.  A claimant's RFC then determines whether he can perform his past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

Here, the ALJ concluded that Metz's impairments prevent him from performing his past relevant work and that his past relevant work provided no transferable skills.  T. 32.  The ALJ found that Metz was a "younger individual between the ages of 18 and 44," and that he had a "limited education."  T. 32.   The ALJ specified that Metz retained an RFC enabling him to perform:

> light work that does not require more than occasional climbing,
> stooping, crouching, crawling, balancing[,] kneeling, no more than
> occasional fine manipulations with the right dominant hand; and that
> allows for occasional difficulty with attention and concentration and
> dealing with work stresses; allows occasional difficulties with respect to
> his ability to understand remember and carry out detailed instructions
> as well as get along with others.

34

T. 21; *see also* T 32.  The regulations define light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b) (2005).

The record supports the ALJ's findings.  There have been two administrative hearings and multiple medical evaluations and treatments in this matter.  The record is fully developed and the conclusions of most of the medical professionals echo the ALJ's findings.  The ALJ reached this determination based upon his evaluation of Metz's physical and mental impairments.  *See* T. 20-31.  With respect to Metz's physical impairments, the ALJ explained that he relied upon the opinions of Drs. Goodman, Balagtas, Price, Kavanaugh, Colman, and Singh.

Dr. Goodman opined that Metz could occasionally lift fifty pounds, frequently lift twenty five pounds, push and/or pull up to seventy five pounds and sit, stand and/or walk for six hours in an eight hour workday.  Dr. Goodman also found only occasional postural limitations with respect to Metz's ability to climb, balance, kneel, crouch, crawl and stoop. He found that Metz's manipulative and visual/communicative functions were unlimited.  Dr. Goodman further found no environmental limitations with respect to Metz's impairment.  T. 597-607.  Dr. Goodman's opinion is consistent with an ability to perform medium work,[17] and thus exceeds, and supports, the limitations of light work as specified by the ALJ: the

---

[17]Medium work involves lifting no more than ifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds.  20 C.F.R. §§ 404.1567(c), 416.967(c).

regulations, of course, state that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

Dr. Balagtas opined that Metz would have some limitations with respect to activities requiring bending, lifting, prolonged sitting and standing as well as activities that require kneeling and squatting.  T. 220-22.   She also opined that Metz would have some limitations in activities that require carrying and possible grasping involving the right hand. With respect to fine motor activities, she noted that Metz's hand and finger dexterity were intact and that his grip strength was four-and-a-half out of five on the right hand and five out of five on the left hand.  T. 812-14.  Dr. Balagtas did not indicate the extent of Metz's limitations with respect to sitting and standing, but her opinion is otherwise generally consistent with the ALJ's RFC determination, which incorporated her assessment that Metz had limitations bending and kneeling as well as possible grasp/grip limitations in his right dominant hand.

Dr. Price's opinion that Metz was restricted to light duty and was capable of performing desk work supports the ALJ's RFC determination.  T. 796.  Dr. Kavanaugh's finding that Metz suffered only minimal loss of range of motion of the cervical spine and his opinion that Metz "was not disabled for work," T. 203, also supports the ALJ's RFC determination.  An attending physician at the Albany Medical Center opined that Metz should neither lift more than fifty pounds nor perform any repetitive bending or lifting.  T. 194-95.  Again, this opinion offered during the course of treatment suggests limitations which exceed those set forth in the ALJ's RFC determination.  Dr. Colman's treatment notes, which state that he could not identify any pathologic entities for Metz's left knee nor any objective findings of disease,  T. 415, 421, also lend support to the ALJ's RFC

determination.  Dr. Singh's treatment notes, which consistently indicated that Metz was stable and that his reflexes and sensory and motor systems were normal, also lend support to the ALJ's RFC determination.  T. 333, 335, 347, 461.

Additional clinical findings buttress the ALJ's decision.  An MRI scan of Metz's brain revealed no abnormalities, while an MRI of his cervical spine showed no evidence of stenosis or nerve root compression. T. 621.  An MRI of his lumbar spine showed only mild degenerative disease, while an X-ray of his lumbar spine revealed no pathology.  T. 222-23, 621.

With respect to Metz' mental impairments, the ALJ explained that he relied upon the reports of Drs. Hartman, Payne and Satloff.  Dr. Hartman opined that Metz was able to follow and understand simple directions and instructions with a fair ability to maintain a regular schedule and make appropriate decisions.  Dr. Hartman noted obvious learning deficits and that Metz would have difficulty performing complex tasks independently.  He noted mild attention and concentration problems.  Dr. Hartman noted mild to moderate difficulty relating adequately with others and mild to moderate difficulty in dealing appropriately with normal life stressors.  T. 810.  The ALJ incorporated into Metz's RFC the limitations that Dr. Hartman assessed including "occasional difficulty dealing with work stresses, problems with attention/concentration understanding and carrying out detailed instructions and dealing with others."  T. 32.

Consistent with the ALJ's RFC assessment, Dr. Payne opined that Metz could follow and understand simple directions and instructions and perform simple, rote tasks under supervision.  She further opined that he had problems with attention and concentration and learning new tasks.  She noted that he had difficulty performing

complex tasks and making appropriate decisions.  She further noted that he had difficulties relating to others and dealing with stress.  She characterized his psychiatric difficulties as moderately limiting.  T. 210-14.

Dr. Satloff noted that Metz's impairment affected his ability to understand, remember and carry out instructions.  He noted no restrictions with respect to Metz's ability to understand and remember short, simple instructions, carry out short, simple instructions or his ability to make judgments on simple work-related decisions but noted moderate restrictions with respect to Metz's ability to understand, remember and carry out detailed instructions.  Dr. Satloff noted moderate restrictions with respect to Metz's ability to interact appropriately with the public and supervisors and his ability to respond appropriately to changes in a routine work setting.  Dr. Satloff noted slight restrictions with respect to Metz's ability to interact appropriately with his co-workers and in his ability to respond appropriately to work pressures.  The medical source statement that Dr. Satloff completed defined the rating "slight" limitation as a mild limitation allowing the individual to "function well" while it defined a "moderate" limitation as allowing "the individual . . . to function satisfactorily."  T. 590.

The ALJ also cited Metz's comprehensive vocational evaluation in support of his determination.  T. 28.  The report found that Metz had vocational potential, and that his manual and visual-perceptual skills supported a variety of unskilled to semiskilled jobs with job coaching.  T. 199.

The outpatient mental health clinic's schizoaffective disorder 295.70 diagnosis is the only such diagnosis to appear in the record.  *Compare* T. 769 *with* T. 568 (social phobia and obsessive compulsive disorder), 595 (major depressive disorder, social

phobia, learning disorder-not otherwise specified, polysubstance abuse by history and borderline intellectual functioning), 821 (major depressive disorder-moderate with possible psychotic features, social phobia, learning disorder-not otherwise specified, polysubstance abuse by history, borderline intellectual functioning). As the Commissioner points out, however, even assuming *arguendo* that the schizoaffective disorder diagnosis were correct, the mere presence of a disease or impairment is not enough to trigger a disability; considering the claimant's age, education and work experience, he must also not be able to engage in any other kind of substantial gainful work in national economy. Rivera v. Harris, 623 F.2d 212, 215-16 (2d Cir. 1980).

The ALJ found that Metz demonstrated that his impairments prevented a return to his past relevant work. Accordingly, the burden then shifted to the Commissioner to prove that a job exists in the national economy which he was capable of performing. *See* Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); 20 C.F.R. § 404.1560(c) (2005). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions in the country." 20 C .F.R. § 404.1566(a) (2005). The ALJ may apply the Grids or consult a vocational expert. *See* Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999); 20 C.F .R. pt. 404, subpt. P, App. 2 (2003). If the claimant's characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he or she is disabled. Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996).

The ALJ solicited the testimony of a vocational expert regarding jobs suitable for a hypothetical person with of Metz's age and with his education, past work experience, and RFC. The ALJ posed a hypothetical question to the vocational expert incorporating Metz's

RFC limitations as described above.  *See* Juleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992) (holding that "the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments") (further citation omitted). Based upon the vocational expert's testimony, *see* Part V(A)(3) *supra*, and relying upon Medical-Vocational Rule 202.21 as a framework, the ALJ found that there were a significant number of jobs in the national economy that Metz could perform as a laundry sorter, DOT occupational code 361.687-014, and housekeeper, DOT occupational code 323.687-014.  T. 32.

Accordingly, it is recommended that the Commissioner's determination in this regard be affirmed.

## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **AFFIRMED,** Metz's motion for a finding of disability be **DENIED,** and the Commissioner's cross-motion be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL

PRECLUDE APPELLATE REVIEW.  <u>Roldan v. Racette</u>, 984 F.2d 85 (2d Cir.1993) (citing

<u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P.

72, 6(a).


DATED:  April 21, 2010
        Albany, New York

David R. Homer
U.S. Magistrate Judge